UNITED STATES OF AMERICA,

          Plaintiff,

    v.                                   Case No. 16-cr-197-pp

ANTOINE RICHMOND,

          Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION (DKT. NO. 31) AND DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. NO. 20)

On February 17, 2017, the defendant filed a motion to suppress a gun seized from behind the screen door of the defendant's home as the fruit of an unconstitutional search. Dkt. No. 20. Magistrate Judge William E. Duffin conducted an evidentiary hearing on March 31, 2017, dkt. no. 28, then issued a report, recommending that this court deny the motion to suppress, dkt. no. 31. After finding that the officers had the reasonable suspicion necessary for an investigative Terry stop, Judge Duffin concluded that the officers' protective search of the area behind the screen door did not violate the Fourth Amendment. The defendant objected to the recommendation on the grounds that (1) the officers did not know whether the defendant was a concealed carry (CCW) permit holder and had no reason to believe that the defendant possessed a gun; (2) the gun posed no reasonable danger to the officers; (3) the Fourth Amendment protects the curtilage of the home; and (4) the officers did not

testify consistently about the defendant's location at the time of the search. Dkt. No. 35. This court held an evidentiary hearing, to conduct a *de novo* review of the evidence. Dkt. No. 42. The court overrules the defendant's objection, adopts Judge Duffin's recommendation and denies the motion to suppress.

## A.   FACTS

This court held its evidentiary hearing on July 12, 2017 at 2:30 p.m.; Officers Chad Boyack and Anthony Milone testified. Dkt. No. 43. Boyack, a twenty-year veteran of the Milwaukee Police Department, works the late power shift—7 p.m. to 3 a.m.—in District 5. Id. at 5. At 11:40 p.m. on October 11, 2017, Boyack and Milone drove north on North Teutonia Avenue before taking a right onto West Vienna Avenue, heading eastbound. Id. at 7. The federal and city governments refer to the area as the Capitol Street Corridor, which is known for the high intensity of drug trafficking, robberies and shootings. Id. at 17.

The officers observed the defendant walking northbound on 19th Place, to the left of a streetlight, with his right hand inside of a kangaroo pouch-style pocket and his left hand free at his side. Id. at 7 and 22. According to Boyack, the defendant's right hand grasped some type of medium-sized object inside the pocket on the right side. Id. at 8. In Boyack's years of training in the academy and his on-the-job experience, he had seen something similar numerous times, and, more often than not, he testified, the object was a firearm. Id. at 8 at 39-40.

The defendant made direct eye contact with the officers in the marked squad car. Id. at 9. As the officers made a U-turn, the defendant picked up his pace, left the sidewalk, and crossed the grass in front of a duplex at 1933/35 West Vienna Avenue. Id. at 9. The officers parked and got out of their car, while the defendant walked up a set of wooden steps onto the porch of that address. Id. at 10-11, and 30. The defendant opened the outer screen door to 1933 with his left hand, pulled his right hand away from his side, and placed a dark object—larger than the outline of his hand—between the threshold of the inner and outer doors. Id. at 11, 30 and 33. Boyack suspected the object was a gun, and, in the officer's experience, he didn't think the defendant was acting the way someone who had a CCW permit would act. Id. at 12. At that point, Boyack stood approximately twenty to twenty-five feet from the defendant. Id.

According to Boyack, the defendant turned around and took a couple of steps down from the top of the porch, and Officer Milone walked behind the defendant toward the door. Id. at 13. Boyack said something to the defendant like "Hey, buddy, Milwaukee Police." Id. at 35. At that point, Boyack had safety concerns, because the defendant was "very well-built, muscular," and things could have gotten "dicey, especially if he decided to fight." Id. at 14. Milone immediately turned around after "looking for not even a second" and said "C1," which, in the understanding of these two officers, was code for an adult arrest over eighteen, but they also use it to mean that a gun is involved. Id. at 15. Boyack took the defendant into custody after the defendant confirmed that he was a felon; felons cannot have CCW permits. Id. at 15-16. Soon after the

officers placed the defendant in the back of the squad car, a woman came to the door, identifying the defendant as her boyfriend or husband. Id. at 16. According to Boyack, the entire incident took approximately twenty-five to thirty seconds. Id. at 17.

Milone, a seven-year veteran of the Milwaukee Police Department, testified that he also worked the power shift on October 11, 2016, with his partner of four-and-a-half years, Boyack. Dkt No. 45. As the passenger in the squad car, Milone looked to his right (south) and observed the defendant walking northbound on the east sidewalk wearing a red t-shirt with a kangaroo pouch. Id. at 46. Milone observed the defendant's right hand in his pocket, and a significantly large bulge coming from the pocket (larger than the size of a hand). Id. at 47. In Milone's experience, such an object "ends up being a firearm." Id. at 47.

Milone, like Boyack, testified that as the officers made a U-turn, the defendant picked up the pace and crossed to the front porch of the duplex at 1933/35 West Vienna. Id. at 48, 49. The porch light was on; Milone observed a black, medium-sized object in the defendant's right hand. Id. The defendant opened the screen door, and placed the object in between the screen and front door. Id. at 49. Milone suspected the defendant had a gun because, with one exception, he had never seen someone with a CCW permit act in the same manner as the defendant. Id. at 50.

Milone walked to the top of the porch while Boyack spoke with the defendant. Id. at 50. Milone crossed to the screen door and tried to open it as

little as possible, so as not to alert the defendant for fear the defendant would lunge or fight. Id. at 50. Milone also expressed concern that someone behind the door (someone from inside the house) could grab the gun. Id. at 52. After seeing a black, Smith & Wesson .40 caliber handgun inside the screen door, Milone said "C1," meaning that he'd located a firearm and that, unless the defendant had a CCW permit, the officers should arrest him. Id. at 51. The defendant admitted to Boyack that he was a felon. Id.

Milone testified that everyone was on the top landing of the porch. Id. at 57. According to Milone, the space between the door and the front step was approximately ten feet. Id. at 59. Reluctant to say that Boyack was mistaken in his recollection that the defendant had come down the porch steps a bit, Milone nonetheless testified that the defendant was very close to the door, to the point that the door would have hit the defendant had it been fully opened. Id. at 59.

B.     CONCLUSIONS OF LAW

Under Terry v. Ohio, 392 U.S. 1, 21 (1968), police officers may detain a suspect for a brief investigatory stop if they have a "reasonable suspicion based on articulable facts that a crime is about to be or has been committed." United States v. Williams, 731 F.3d 678, 683 (7th Cir. 2013) (quoting United States v. Carlisle, 614 F.3d 750, 754 (7th Cir. 2010)). Reasonable suspicion "is more than a hunch but less than probable cause and considerably less than preponderance of the evidence." Jewett v. Anders, 521 F.3d 818, 823 (7th Cir. 2008) (internal quotations omitted). It requires "some minimal level of objective

justification for making a stop," given the "totality of the circumstances" and "common-sensical judgments and inferences about human behavior." Id. (internal quotations omitted).

When used by trained law enforcement officers, "objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion." United States v. Cortez, 449 U.S. 411, 419 (1981). Because courts evaluate reasonable suspicion in light of the totality of the circumstances, "behavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when viewed in the context of other factors at play." United States v. Baskin, 401 F.3d 788, 793 (7th Cir. 2005).

The court finds that the totality of the circumstances provided the officers with reasonable suspicion that the defendant was doing something unlawful. The officers were patrolling a known high-crime area about twenty minutes before midnight when they first saw the defendant. He was walking down a sidewalk by himself late at night, with either one or two hands inside the kangaroo pocket of his shirt, and the officers saw either an "object" (Boyack) or a "bulge" (Milone), larger than the size of a hand, in the pocket. The defendant made eye contact with the officers in the marked squad car, then "darted," or quickened his pace, crossing the grass to reach the porch of the residence. As they approached him, the officers saw the defendant open the screen door, and place a dark object—larger than his hand—between the

screen and front doors. Id. at 12. Their view was illuminated both by a streetlight and the porch light. Both officers testified, based on their training and experience, that the defendant was not acting the way someone would act if that person had a valid CCW permit.

An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. Brown v. Texas, 443 U.S. 47 (1979). At the same time, the officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. See Adams v. Williams, 407 U.S. 143, 144 (1972). In this instance, the officers saw someone in a high crime area, late at night, walking alone with his hands in a pocket that contained a bulge, and when the person saw the squad car, he quickened his pace, eventually putting something between the screen and front doors of a house. This combination of facts gave the officers reasonable suspicion to believe that the defendant may have been engaged in criminal activity.

The real issue is whether Milone violated the Fourth Amendment when he opened the screen door. Officers may conduct a limited, protective search without a warrant during a Terry stop, but such a search is "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993). In Michigan v. Long, the Supreme Court explained that Terry did not restrict a protective search to the suspect, because a Terry suspect could break

away and retrieve a weapon from somewhere nearby. Long, 463 U.S. 1032, 1051 (1983). Similarly, in Maryland v. Buie, the Supreme Court reiterated that Terry and Long "were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them." Buie, 494 U.S. 325, 334 (1990).

The court agrees with the defendant that when Milone pulled the screen door open, he conducted a search. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," United States v. United States District Court, Eastern District of Michigan, 407 U.S. 297, 313 (1972), and when Officer Milone opened the screen door, he was conducting such a physical entry. The court finds, however, that Milone's search was narrowly confined to the only place from which the officers had reason to believe that the defendant (or someone in the house) could have obtained a weapon. See Leaf v. Shelnutt, 400 F.3d 1070 (7th Cir. 2005). Both officers described a dynamic, fluid situation of relatively short duration. The defendant was standing either on the porch or on a step near it, in the immediate vicinity of the officers, after they had watched him place a dark object in the door, which the officers reasonably suspected to be a gun. The defendant, as the court observed, is a large, muscular man, who stood unrestrained within a stride or two of the gun. Regardless of whether the defendant remained at the door or had moved to the steps, the defendants' own exhibits (particularly

8

Exhibit Six) confirm that the porch was narrow, and that the defendant could have armed himself quickly had he chosen to turn back for the gun. Id. at 18, 41-42. Boyack also expressed concern that he did not know who owned the property or who might open the door. Id. at 18. Terry allows officers to protect themselves from immediate danger. Here, the officers had a reasonable belief based on specific and articulable facts that the limited area they searched contained a weapon posing a danger to those on the scene.

### C.    CONCLUSION

The court **ADOPTS** the recommendation of Magistrate Judge William E. Duffin, dkt. no. 31, and **DENIES** the defendant's motion to suppress, dkt. no. 20. The court's staff will set a date for a telephonic scheduling conference, in order to discuss a final pretrial conference date and a trial date.

Dated in Milwaukee, Wisconsin, this 28th day of August, 2017.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**